# UNITED STATES DISTRICT COURT

**District of Kansas**

(Topeka Docket)

**UNITED STATES OF AMERICA,**
                    **Plaintiff,**


                        **v.**                                   **CASE NO. 24-40035-TC**

**JEREMY ALLEN WEBER,**
                        **Defendant.**

## GOVERNMENT'S SENTENCING MEMORADUM AND MOTION FOR UPWARD DEPARTURE AND/OR VARIANCE

**COMES NOW** the United States of America, by and through Ryan A. Kriegshauser, United States Attorney for the District of Kansas, and Sara L. Walton, Assistant United States Attorney, and respectfully requests the Court impose a sentence of 20 years imprisonment, followed by a term of lifetime supervised release, a $100 special assessment per count, a $5,000 JVTA assessment per count, and a $1000 AVAA assessment. The government request the Court schedule a hearing on the issue of restitution at a date within 90 days sentencing.

This a novel child pornography case in the District of Kansas. The defendant stands convicted of five counts of transportation of child pornography, each depicting a child known to the defendant engaged in sexually explicit conduct manufactured through the use of AI technology, and one count of possession of child pornography. Each count of transportation of child pornography mandates a sentence of no less than five years. However, the counts of conviction represent only a small fraction of

the defendant's overall conduct, and the advisory Guideline range grossly underrepresents the harm inflicted on the victims. The government is asking the Court to impose a sentence of 20 years imprisonment followed by a lifetime term of supervised release to reflect the seriousness of the offense and provide just punishment.

## I.    SENTENCING IN GENERAL

The sentencing court must engage in a three-part analysis to determine the appropriate sentence.  First, the court must consider the Guideline range. A sentence imposed within the guideline range is presumptively reasonable. *See Rita v. United States*, 551 U.S. 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). Second, the court must address any grounds for departure provided in the policy statements.  Third, the court last considers the factors under 18 U.S.C. § 3553(a). See *Rita*, 551 U.S. at 351. The court's responsibility is to impose a sentence that is "sufficient" but "not greater than necessary" to meet the sentencing objectives in that provision. *United States v. Kaspereit*, 994 F.3d 1202, 1214 (10th Cir. 2021) (internal citations omitted). See also 2021 Guidelines Manual, § 1B1.1, pg. 17-18. See also 2021 Guidelines Manual, § 1B1.1, pg. 17-18.

## II.    THE SENTENCING GUIDELINES

The recommendations of the Sentencing Guidelines are no longer mandatory, but sentencing courts "must consult these Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). The Sentencing Guidelines are "the 'starting point and the initial benchmark.'" *Kimbrough v. United*

*States*, 552 U.S. 85, 108 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007) (noting that the Guidelines should "be kept in mind throughout the process")).

On October 15, 2025, the United States Probation Office (USPO) prepared a Presentence Investigation Report (PSR) using the 2024 United States Sentencing Guidelines Manual (USSG). The guideline for a violation of 18 U.S.C. § 2252A(a)(1) is USSG § 2G2.2. The base offense level for the defendant's conviction is 22, with applicable adjustments, the total offense level is 37. The defendant's criminal history category is I, resulting in a guideline imprisonment range of 151 months to 188 months. As detailed further below, the defendant objects to the application of the specific offense characteristics and the calculation of the Guideline range.

### III.    GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR

The defendant filed the following objections to the PSR: (1) the defendant objected to the application of a 2-point enhancement for distribution (PSR ¶ 44); and (2) the defendant objected to inclusion of a restitution request from the defendant's employer (PSR ¶ 138).  The Court should overrule these objections.

***The PSR Correctly Applied a Two-Level Enhancement under U.S.S.G. § 2G2.2(b)(3)(F)***

The PSR correctly applied the 2-point enhancement for distribution pursuant to § 2G2.2(b)(3)(F). The guideline commentary Application Notes defines distribution as:

> Any act, including possession with intent to distribute, production, advertisement, and transportation, related to the transfer of material involving the sexual exploitation of a minor. Accordingly, distribution includes posting material involving the sexual exploitation of a minor on a website for

public viewing but does not include the mere solicitation of such material by the defendant.

The definition of distribution in the commentary is broader than the definition cited by the defendant, as noted by the Court in *United States v. Geiner*, 498 F.3d 1104 (10th Cir.2007). In *United States v. Burgess*, 576 F.32d 1078, 1101-2 (10th Cir.2009), the Court rejected the defendant's argument that distribution could not include individuals who transported material without intending it to be transported to anyone else. The Court cited a Sixth Circuit opinion, *United States v. Fore,* 507 F.3d 412, 415 (6th Cir.2007), which stated in relevant part:

> "However, defendant has not met the second requirement because his criminal conduct was not limited to the receipt or solicitation of pornographic materials, but also encompassed the transportation of materials involving the sexual exploitation of a minor in interstate commerce in violation of 18 U.S.C. § 2252(a)(1), an offense that is separate and distinct from, and goes beyond, the mere receipt or solicitation of pornography proscribed by 18 U.S.C. § 2252(a)(4)(B)."

The government need not prove that child pornography was actually transferred to trigger the 2G2.2(b)(3)(F) enhancement. *See United States v. Ramos*, 695 F.3d 1035, 1040 (10th Cir.2012). As previously discussed, the commentary defines distribution as "any act, including possession with intent to distribute, production, transmission, advertisement, and transportation, *related to* the transfer of material involving the sexual exploitation of a minor." This list of prohibited conduct is non-exhaustive. Additionally, the commentary includes the phrase *related to*, which would therefore extend distribution to include any act that had similar properties to an act that involved the movement of child pornography from one place to another. *See Id.* at 1040-1041 (10th Cir.2012).

4

The Tenth Circuit has further rejected the argument that the government must establish an affirmative act on the part of the defendant to make the material available to others. *See Id.* at 1042.

Further, the guideline commentary on the application of Subsection (b)(3) reads:

> for the purposes of subsection (b)(3), the defendant 'knowingly engaged in distribution' if the defendant (A) knowingly committed the distribution, (B) aided, abetted, counseled, commanded, induced, precured, or willfully caused the distribution, or (C) conspired to distribute.

In 2016, the Commission amended the commentary to 2G2.2(b)(3)(F) and inserted the phrase "*knowingly* engaged in distribution." However, the inclusion of the scienter requirement does not alter the Guideline definition of distribution, nor the line of cases interpreting the application of that Guideline to offense conduct. Rather, it provides for a two-step analysis: (1) did the defendant engaged in distribution; and (2) was it done knowingly.

Here, the defendant knowingly engaged in distribution or caused the distribution of child pornography. Distribution, as argued above, does not require the actual transfer of child pornography to another individual. Rather, it requires only that the government establish by a preponderance of the evidence that the defendant engaged in an act that involved the movement of child pornography from one place to another.

The defendant uploaded child pornography to a website, Faceswapper.AI. Faceswapper.AI is a publicly available online tool that allows users to upload images

to generate new content.  The user uploads the image to the tool's servers to use the product. The parent company, Vertexhare Limted, lists a physical address in Hong Kong.  The Terms and Conditions on the Faceswapper.AI site state that the provider has limited rights to the files uploaded to the tool as required to enable the provider to offer their services.  It also notes that the provider may use third-party providers to deliver the services as well. Per the provider's Privacy Policy, Faceswapper.AI claims to purge the uploaded and generated content every 6 hours to allow for more server space.

The defendant utilized this online tool to create new images of child pornography when he uploaded a known file of child pornography to the server, along with an image of a known female.  The provider's software used those images to generate an entirely new image of pornography, depicting the known individual engaged in sexually explicit conduct.  After the defendant used the online tool to produce the new image, he moved the file from the online tool to an encrypted drive for storage.

This digital path clearly demonstrates that the defendant knowingly engaged in the distribution of child pornography to the online service provider, Faceswapper.AI. The government is not required under the plain language of the Guidelines to prove that the defendant intended another individual to view the child pornography nor that another individual did in fact view the child pornography.

Although the government contends the defendant's transfer and uploading of child pornography files to the provider is more than sufficient to establish

distribution, the defendant also distributed the images by making them available for a third-party IT vendor to view.  The defendant utilized his work laptop to engage in the offense conduct during working hours.  The defendant not only viewed child pornography on his work laptop during work hours, but he also manufactured the new child pornography images through the use of the online AI tool.  The defendant transferred the files depicting child pornography between the online service provider, his laptop and an attached encrypted hard drive with full knowledge that his computer was accessible to others.  As reflected in PSR ¶ 86, the defendant provided general IT support for his employer.  His employer also contracted with the third-party provider for additional services.  It was this third-party provider who remotely accessed the defendant's laptop and observed child pornography displayed on the device.  Much like the example provided in the Guideline commentary, the defendant knowingly made the images available for viewing by those with remote access to his device, sufficient to meet the Guideline definition of distribution.

The defendant's experience in the IT field is also relevant to the application of 2G2.2(b)(3)(F).  The defendant cannot claim he engaged in the above conduct without full knowledge that he was transferring pornography over the internet to third-party providers.  Nor can he claim he did not know the IT provider had the ability to remotely access his work device.

Applying the definition of distribution as provided in the commentary, the 2-level enhancement is properly applied in the sentencing calculation.

***The PSR Correctly Includes the Restitution Request from the Defendant's Former Employer***

Lastly, the defendant objects to the restitution requested by Agency X.[1] Pursuant to the terms of the plea agreement, as well as 18 U.S.C. § 2259 and 18 U.S.C. § 3663, the corporate entity of Agency X on behalf of its employees and shareholders, is entitled to request restitution. Specifically, the defendant agreed not to oppose identified victims not reflected in the Indictment or adults with a significant interest in the matter from exercising his or her rights under 18 U.S.C. § 3771 (the Crime Victim's Rights Act, CRVA). The CVRA includes the right to full and timely restitution as provided by law. *See* 18 U.S.C. § 3771(A)(6). 18 U.S.C. § 2259 provides for mandatory restitution for victims of any Chapter 10 offense. Victim is defined as: an individual harmed as a result of the commission of a crime under Chapter 110. *See 18 U.S.C.* § 2259(c)(4). 18 U.S.C. § 3663 further provides that the Court may order restitution to the victim of any Title 18 offense. 18 U.S.C. § 3662(a)(2) defines victim as a person directly and proximately harmed as a result of the commission of an offense.

The defendant utilized Agency X property to commit the offense, he used his access to employee information to locate images used in the offense conduct, and he victimized nearly all of the company's female employees. His conduct disrupted normal operations for Agency X on multiple occasions, including during the investigation and prosecution of the matter. Agency X was harmed as a result of the

---

[1] The government is referring to the employer the name "Agency X" to protect the privacy of the employer and employees.

8

defendant's commission of the offense conduct and should be afforded the ability to exercise its rights under the CVRA. This includes the right to restitution, as provided by law. Whether the requested amount is legally authorized pursuant to 18 U.S.C. §§ 2259 and 3663 is a collateral matter that is more appropriate for argument in the parties' sentencing memorandum, or at a separate restitution hearing if necessary. The requested restitution should be reflected in the final PSR.

IV.     GOVERNMENT'S REQUEST FOR UPWARD DEPARTURE

A nominal, three-level upward departure is appropriate in this case under three theories: (1) USSG § 2G2.2(b)(7), comment. (n.4(B)(i) and (ii)); (2) U.S.S.G. § 5K2.21 for dismissed or uncharged conduct that did not enter into the determination of the applicable guideline range; and (3) U.S.S.G. §5K2.0(a)(1)(B) for aggravating circumstances and U.S.S.G. §5K2.0(a)(2) for circumstances of a kind not adequately taken into consideration. "The Sentencing Commission has explained that the sentencing court should treat each guideline as carving out a heartland, a set of typical cases embodying the conduct that each guideline describes. Accordingly, in an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether departure is warranted." *United States v. Hanson*, 264 F.3d 988, 993-94 (10th Cir. 2001) (quotations and citations omitted) and U.S.S.G. Chapter 1, Part A, pg. 7. The Sentencing Commission further notes that it is "difficult to describe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." *Id*. at pg. 7

"[T]he propriety of an upward departure is . . . guided by the traditional four-part test, which inquires (1) whether the district court relied on permissible departure factors, (2) whether those factors removed a defendant from the applicable Guidelines heartland, (3) whether the record supports the district court's factual bases for a departure, and (4) whether the degree of departure is reasonable." *United States v. Robertson*, 568 F.3d 1203, 1211 (10th Cir. 2009) (citation omitted).

### Departure Based on USSG § 2G2.2(b)(7), comment. (n.4(B)(i) and (ii))

First, the PSR detailed the factors that may warrant a departure from the Guideline range. Pursuant to U.S.S.G. § 2G2.2(b)(7), comment. (n.4(B)(i)), if the number of images substantially underrepresents the number of minors depicted, an upward departure may be warranted. Additionally, pursuant to U.S.S.G. § 2G2.2(b)(7), comment. (n.4(B)(ii)) if the length of the video is substantially more than five minutes, an upward departure may be warranted. Here, the number of images substantially underrepresents the numbers of minors depicted.  For each identified minor victim (or adult depicted as a minor), the defendant took an existing image of child pornography and created new child pornography. For some of the victims, he created hundreds of images of new child pornography, victimizing both the original minor depicted in the image and the minor who was used to create the new image. In total, investigators identified 6637 images of child pornography, over ten times the upper threshold for the enhancement.

Further, the defendant possessed approximately 177 videos depicting child pornography, including videos that were substantially more than five minutes in

length. For example, the defendant possessed a 12-minute video, a 14-minute video, and a 46-minute video, depicting the sexual assault of minors. With the underrepresentation of the number of minors depicted in the images and the length of the videos the defendant possessed; this case falls well outside the heartland of child pornography cases.

***Departure Based Upon U.S.S.G. § 5K2.21***

Second, the Court should depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case or underlying a potential charge not pursued in the case as part of the plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable Guideline range. *See* U.S.S.G. § 5K2.21.

The defendant was originally indicted on 16 counts of transportation of child pornography, in violation of 18 U.S.C. § 2252A(a)(1), 16 counts of receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2) and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). The sixteen counts represented the 16 identified victims whose images were used to manufacture CSAM, five current minors and 11 adults known to the government at the time of Indictment. Ultimately, the government identified 11 minors and 21 adults, all of whom were known to the defendant, whose images were used to create thousands of new CSAM images, in violation of federal law. Moreover, the used the images of 50-60 adults to create adult pornography or sexually explicit conduct, which at the time, was not a crime under federal law. Ultimately, the defendant agreed to plead to guilty to one

count for each identified minor in the Indictment, and a single count of possession to encompass all of the victims.  In exchange, the government agreed to dismiss the remaining 27 counts and not charge any additional counts for the subsequently identified victims.

Because of the mandatory grouping of all offenses that fall within the same Guideline, the defendant's Guideline sentence was not impacted by the dismissal of the 27 counts or the unpursued charges. *See* PSR ¶ 41 and U.S.S.G. § 3D1.2(d). Stated another way, the defendant was given a volume discount for a multiple victim offender. The defendant's Guideline sentence was the same if he was convicted of one count or if he was convicted of fifty counts. Contrary to the language of U.S.S.G. § 3D1.2(d), the Guidelines do not measure the aggregate harm of these collective victims, rather, the Guideline ignores the individual harm the defendant inflicted on over 50 persons, including the five minors named in the counts of conviction.

The Guideline calculation in this case does not reflect the actual seriousness of the offense. Therefore, the Court should depart upward based on the conduct of the 27 dismissed counts and numerous unpursued charges that did not enter into the determination of the applicable Guideline range.

### *Departure Based Upon U.S.S.G. §5K2.0(a)(1) and (2)*

Third, the facts of this case warrant an upward an upward departure pursuant to U.S.S.G. §5K2.0(a)(1)(B) and (2)(B). U.S.S.G. §5K2.0(a)(1)(B) provides that "the sentencing court may depart from the applicable guideline range if…in the case of crimes and sexual offenses, the court finds, pursuant to 18 U.S.C. § 3553(b)(2)(A)(i),

that there exists an aggravating or mitigating circumstance." Additionally, U.S.S.G. §5K2.0(a)(2)(B) provides for departure in "the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining an appropriate sentence."

18 U.S.C. § 3553(b)(1) qualifies departures for aggravating or mitigating circumstances as those of "a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission…In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission."

The defendant's conduct, the systematic exploitation of over 50 individuals, including 11 minors, encompassed aggravating facts which are not considered by the Guidelines but must be considered in determining an appropriate sentence. This case illustrates the disparity between the application of the Guidelines and the advancement of offender conduct in the age of AI. Additionally, it also demonstrates the disconnect between the statutory framework of child exploitation offense and evolving offender behavior.

Several factors relevant to the determination of the defendant's sentence are not considered by the Guidelines. First, the Guidelines mandate the grouping of all counts that fall under U.S.S.G. § 2G2.2, ignoring the individual harm inflicted on each victim. The presumptive grouping of all counts under § 2G2.2 generally reflects the aggregate harm of offenders who engage in the trafficking of existing child

13

pornography only. In contrast, for production offenders who are sentenced under U.S.S.G. § 2G2.1, counts involving different victims never group. Rather, they are subject to a multiple group/count enhancement, amounting to approximately one offense level per count. *See* U.S.S.G. § 3D1.4.

Because the defendant used existing photos of the victims to create the new child pornography, his conduct does not qualify for the cross reference to § 2G2.1, nor is the underlying conduct legally sufficient for a charge of production in violation of 18 U.S.C. § 2251. Despite this, the defendant was not merely trafficking existing images of child pornography, as contemplated by 18 U.S.C. § 2252A and § 2G2.2. He was using the images of individuals known to him, such as family, fellow church members and co-workers to create new child pornography depicting those individuals engaged in sexually explicit conduct. For some, he created images that depicted a mother sexually abusing her daughter. He was not only revictimizing the minors from the original images, he added new victims with each morphed image.

To further aggregate his conduct, the defendant also created sexually explicit images of approximately 50-60 adults known to the defendant engaged in sexual acts. The defendant manipulated adult pornographic material to depict himself engaged in sexual acts with his coworkers and even his own mother, images of his wife and daughter in explicit clothing, images of adults engaged in sexual acts with each other, and images depicting the adult posed nude or engaged in masturbation. Any female who came into contact with the defendant was vulnerable to his exploitation.

Although the government did not locate evidence of distribution, the full extent

of the defendant's conduct is unknown as he took measures to encrypt devices and used encrypted electronic service providers. Further, the defendant used an AI platform outside the government's legal process. Very little public information is available to guarantee the trustworthiness of the site's claim of privacy and file destruction. Because the defendant used this new technology, it is unknown how the files were stored or destroyed, and the victims must live with the constant fear that the manufactured images are available on the internet.

The defendant's conduct is not captured by the Guidelines, nor considered in policy statements, or official Commission commentary. The aggravating circumstances of this offense warrant an upward departure to 20 years imprisonment.

## V. GOVERNMENT'S ARGUMENTS IN SUPPORT OF AN UPWARD VARIANCE TO A TERM OF IMPRISONMENT OF 20 YEARS

A sentence of 20 years imprisonment is sufficient but not greater than necessary for this defendant who engaged the sexual exploitation of over 50 victims, including minors and adults. This is not a typical child pornography case and an upward variance from the guideline range of 151-188 is not only appropriate, but necessary to account for the seriousness of the defendant's conduct and provide just punishment.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113

(1996). 18 U.S.C. § 3553(a) provides seven statutory factors for the court to consider to impose a sentence that is sufficient, but not greater than necessary: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for a sentence to reflect the seriousness of the crime, deter future criminal conduct, prevent the defendant from committing more crimes and provide rehabilitation; (3) the sentences that are legally available; (4) the sentencings guidelines; (5) the Sentencing Commission's policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution. The sentencing court can and should engage in a holistic inquiry of these factors. *United States v. Lente*, 759 F.3d 1149, 1174 (10th Cir. 2014). A district court should not rely solely on one § 3553(a) factor without addressing other relevant factors. *United States v. Walker*, 844 F.3d 1253, 1259 (10th Cir. 2019). However, the district court need not afford equal weight to each § 3553(a) factor. *United States v. Cookson*, 922 F.3d 1079, 1094 (10th Cir. 2019).

### The nature and circumstances of the offense and the history and characteristics of the defendant.

First, the Court should consider the nature and circumstances of the offense and the history and characteristics of the defendant. For this defendant, that requires the Court to weigh the depravity of his conduct with him as an individual.

*Nature and Circumstances of the Offense*

The nature and circumstances of the offense justify an upward variance to 20-years. The defendant's predatory conduct did not discriminate as he victimized children, adults, members of his own family, his church community and his

16

coworkers. Any female, in any facet of the defendant's life, was susceptible to his perversion.

The defendant engaged in the traditional uploading of child pornography and the novel act of using AI to manufacture images of child pornography from innocent photos of children and adults he knew. For some of the adults, he utilized age-regression technology or found pictures from the individual's childhood to generate child pornography. Because of the advancement of AI technology, including publicly available and free online platforms, the images are indistinguishable from an authentic image.

Further, in addition to the use of photos to create child pornography, the defendant also utilized AI technology to manufacture adult pornography and explicit images of adult women. Although this conduct did not raise to the level of a federal offense at the time, the defendant's violation of trust and dignity of these individuals cannot be understated. In an era of camera phones and Facetime, many of these victims, chose NOT to produce and distribute explicit images to prevent the unauthorized dissemination of those images and professional consequences. Now, because of the defendant's actions, these victims no longer have a choice.

The defendant's conduct was deliberate and methodical. The defendant utilized an encrypted external hard drive to protect his work. He cataloged his projects in 76 subfolders named for each victim, along with the acronyms CC (for celebrities), FF (for friends and family) and PP (for professional). Inside each folder was a headshot or other innocent image of the victim and newly manufactured images

of the victim depicted in child pornography or sexually explicit images. Some subfolders contained only a handful of images, while others, contained hundreds. An additional folder labeled "Multi" contained morphed images depicting multiple victims engaged in sex acts with each other or images of the defendant engaged in posed sex acts with the victims.

Ultimately, however, the defendant was reckless. He brazenly engaged in the offense conduct while working remotely from his home. He viewed child pornography while communicating via a chat with his co-workers. He used Facewapper.AI to manufacture child pornography while he responded to email and he exposed an IT professional, who remotely accessed the defendant's company issued computer, to the criminal conduct. Before reporting to law enforcement. the IT professional captured screen shots of the defendant's device which included the password for the encrypted hard drive containing the hundred, if not thousands, of newly create images depicting the sexual exploitation of children and adults.

Lastly, the defendant's conduct impacted his family as well. Not only did he prey on his wife and daughter, morphing their faces into explicit images, his actions destroyed their normalcy. Prior to his arrest, his wife operated an in-home daycare, but the State of Kansas revoked her license after it learned of the defendant's conduct. His wife was forced to sell the family home and other belongings to support the couple's children while the defendant sat in pretrial detention. For his children, they will grow up without their dad, as he will miss all the adolescent milestones.

Although the Court must consider factors beyond the nature of circumstances

of the offense conduct, the Court should nonetheless give significant weight to this factor in crafting his sentence.

*History and Characteristics of the Defendant*

All of us face challenges in our lives, some more severe, some less severe. But no challenge excuses the defendant's conduct. The defendant made hundreds, if not thousands, of deliberate choices to use innocent images to manufacture new child pornography and other sexually explicit material. His criminal conduct progressed from the mere trafficking of child pornography to the manufacture of images of people he knew for his own arousal.

The government anticipates that the defendant will direct the Court to his lack of criminal history at the time of the offense and his own childhood trauma as mitigation to place downward pressure on his sentence. However, no mitigating factors are present to an unusual degree to distinguish the defendant from similarly situated offenders.

As reflected in Part C of the PSR, the defendant's reports he excelled at school and engaged in art and band. He graduated from Kansas State University where in played in the pep band and was in a fraternity. Prior to his arrest, he had steady employment. He is married and has three children. His criminal history category is I. However, the defendant is not unique in the community of child pornography offenders. Child pornography offenders are overwhelming white, United States citizens with little to no criminal history. Specifically, per the Commission's available data on child pornography offenders from 2019, 80.3% of the offenders were white,

96.3% were United States citizens, and 75.9% fell into criminal history category I.[2] In contrast, for all other federal offenders for 2019, only 19.1% were white, 55.9% were United States citizens and 43.8% of the offenders were assigned a criminal history category of I.

The defendant may have suffered sexual abuse himself as child, and the government is sensitive to such trauma. However, available research on the victim-offender cycle of male sexual abuse does not support a connection between past abuse and future abusing.[3] Prior victimization at best may lessens the moral culpability of the defendant but does not in any way minimize his behavior and legal culpability.

On balance, the defendant could have sought out treatment, he was educated, married and employed. Yet, he chose to prey on those closest to him. The nature and circumstances of these offenses and pattern of non-offense conduct weighs heavily in favor of the government's recommended sentence of 20 years.

**The need for a sentence to reflect the seriousness of the crime, to promote respect for the law and to provide just punishment for the offense**

Second, the sentence must reflect the seriousness of the crime, to promote respect for the law and to provide just punishment for the offense. Punishment is the

---

[2] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf, page 18.

[3] "The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend.  However, there are serious limitations to this explanation…" Lambie, Ian et al., "Resiliency in the victim-offender cycle in male sexual abuse" in Sex Abuse: A Journal of Research and Treatment 14(1) (2002) at 43.  *See also* Glasser, M. et al., "Cycle of child sexual abuse: links between being a victim and becoming a perpetrator" in The British Journal of Psychiatry 179 (2001) at 488 (noting that "the data do not provide strong support for a cycle of sexual substantial proportion of male perpetrators"); and Briggs, F. and R. Hawkins, "A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders" in Child Abuse & Neglect 20(3) (1996) at 230 (concluding that "[S]exual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations.").

way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion. *See Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976). Here, the seriousness of the crime, the need for deterrence, and just punishment justify a sentence of 20 years.

With the proliferation of AI technology, offenders such as the defendant will continue to evolve in the methods and means of sexually exploiting children. Those with a deviant sexual interest in children are no longer constrained by the receipt and distribution of existing child pornography, they can manipulate and even create new images of CSAM. These new morphed images, often indistinguishable from real images, will become the currency of these traffickers, victimizing both children and adults, countless times without their knowledge. This case represents the first case of its kind in this District and the Court is in a position to send a message that this conduct will not be tolerated or minimized in severity.

*Seriousness of the Crime*

Crimes involving the exploitation of children are unquestionably some of the most serious crimes before the Court. See *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 244 (2002) ("The sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people."). Congress has plainly indicated that "[e]very instance of viewing images of child pornography represents a ...repetition of their abuse." 18 U.S.C. § 2251, (Historical and Statutory Notes: Child Pornography Prevention of 2006, Pub.L.No. 109-248, Title V, § 501, July 27, 2006,

21

120 Stat. 587, 623 (2006)).

The impact of these crimes on the victims is far reaching. As best exemplified through the collection of impact statements provided to the Court, the defendant's conduct extended beyond the repetition of prior abuse. The defendant, out of his own selfishness, elected to victimize those closest to him. The defendant may argue his conduct did not hurt anyone, claiming no one knew of the victimization until after the defendant was caught. This argument is without merit and insulting to the victims of this offense. A crime committed in secret is no less serious than a crime committed in front of a dozen witnesses.

For the 11 minor victims, the victimization also included their parents; parents who were put in the impossible situation of whether to tell their child of the abuse or protect their child's innocence. For the child whose parents' elected to tell her of the abuse, the child must now grow up without the virtue and belief that people who are supposed to care about her, will keep her safe. The child is forced to grapple with topics that she likely does not understand and asking her questions her parents cannot answer. However, regardless of the parents' decision, on the child's 18th birthday, the child will receive a notification from the National Center for Missing and Exploited Children, informing her that she was previously identified as a victim of sexual exploitation, and her image is cataloged among millions of other exploited children.

Although not all of the images the defendant manufactured constituted a federal crime, the victims depicted in the images are experiencing the same, if not

more, emotional fear and pain as the federal victims. For some of these victims, Congress recognized the harm inflicted by the nonconsensual creation and publication of explicit images when it passed the "TAKE IT DOWN Act," codified in 47 U.S.C. § 223, and signed into law on May 19, 2025.

Considering the seriousness of the defendant's conduct, especially the harm inflicted on the victims, an upward variance to 20 years is appropriate punishment. The Court must express an proper level of condemnation for these novel crimes and a Guideline sentence does not achieve those ends.

**The need for the sentence to deter future criminal conduct, prevent the defendant from committing more crimes and provide rehabilitation.**

*Deter Future Criminal Conduct and Protecting the Public*

Congress, the Supreme Court, and the Sentencing Commission believe deterrence is a very important factor when dealing with those who sexually exploit children. *United States v. Ferber*, 458 U.S. 747, 760 (1982). In *Ferber*, the Court held: "[T]he most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product."

A long custodial sentence is necessary to minimize the risk of harm to the public posed by the defendant. The defendant reported that he consumed child pornography for over 20 years and had twice been "caught" by a roommate and his wife. *See* PSR ¶ 78. The "binging and purging nature" of his conduct was insufficient to satisfy his sexual wants and he turned to those known to him and used innocent photos to manufacture sexually explicit images of children he knew.

As noted in the PSR, in 2014, a six-year-old girl, a foster child living in the defendant's home, accused the defendant of sexually abuse. Although her claims were unsubstantiated, the child reported during a forensic interview that the defendant sexual abused her. In light of the new evidence discovered 10 years later on the defendant's devices, the child's claim demonstrates the true risk the defendant, and individuals like him, pose to children.

Research focused on federal offenders published in the *Journal of Sexual Aggression* underscores the grave risk that crimes like possession and distribution of child pornography pose to children. The lack of physical contact in these offenses has fostered a frequent, erroneous assumption that "these offenders are somehow distinct from child molesters (i.e., 'hands-on' abusers)" and therefore not deserving of guideline sentences. M.L. Bourke, et. al., *The Use of Tactical Polygraph with Sex Offenders*, J. of Sexual Aggression 1, 5 (2014). (The authors are of this article were exclusively federal researchers or investigators, from the U.S. Marshals Service, FBI, U.S. Postal Inspection Service, U.S. Secret Service and U.S. Attorney's Office).

Significantly, in a sample of 127 suspects with no known history of hands-on offending, only 4.7% admitted sexually offending against at least one child victim. During polygraph, an additional 52.8% of the men tested disclosed hands-on sexual abuse. Id. at 17. The researchers drew the following conclusions from their work: 1) researchers, treatment providers and legal officials should avoid placing offenders into groups labeled as "hands-off" based on the absence of such crimes in their criminal histories; 2) the study affirmed extant research that child pornography

offenders are sexually attracted to children, and that a large percentage of these individuals have victimized at least one child via an act of hands-on sexual abuse; 3) "significant crossover" exists between contact and non-contact child exploitation because of the shared motivational pathway – sexual interest in children.  Id. at 11, 20-21.

*Prevention and Rehabilitation*

A 20-year sentence will protect the public from further crimes of the defendant and provide the defendant with the resources and opportunity for rehabilitation. While imprisoned with the United States Bureau of Prisons (USBOP), the defendant will have access to treatment in a community-based setting. USBOP operates a Sex Offender Management Program (SOMP) which offers a Non-Residential Sex Offender Treatment Program (SOTP-NR).  The goals of the SOTP-NR include: (1) decrease the risk of sexual reoffending; (2) increase resilience and improve quality of life; (3) build healthy, rewarding, and meaningful relationships; and (4) develop a new sense of purpose and meaning in life.  The available programs help to address distorted thinking, manage reactions, accept responsibility and improve social skills and overall interpersonal functioning.

In addition, a term of lifetime supervised release pending discharge from USBOP is justified in this case. "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000).  Supervised release is not a punishment in lieu of incarceration.  *See United States v. Granderson*, 511 U.S. 39, 50 (1994).  Lifetime supervised release is

reasonable and appropriate in this case to achieve rehabilitative ends and continue with a necessary treatment plan.

A 20-year sentence followed by a lifetime term of supervised release reflects the seriousness of the crime, the need for deterrence, and just punishment. Further, the defendant will have access to necessary treatment to aid in rehabilitation.

**The sentences that are legally available.**

The combined penalty for all counts is a minimum of five years imprisonment and a maximum term of 110 years. Supervised release must be imposed for a term of no less than 5 years and no more than life.

**The sentencing Guidelines.**

Fourth, the Court must consider the sentencing Guidelines. As previously argued in the government's request for a departure, the Guidelines do not adequately account for the circumstances surrounding the defendant's conduct. The Guidelines and the current legal framework have not kept up with the offender conduct in the age of AI. The Court should consider them as advisory, a starting point, and vary upward to adjust for the specific facts of the offense.

**The Sentencing Commission's policy statements.**

Fifth, the Sentencing Commission's policy statements focus on the three Congressional objectives of the Sentencing Reform Act of 1984: (1) combat crime through an effective, fair sentencing system; (2) create reasonable uniformity in sentencing and (3) create proportionality in sentencing through a system that imposes appropriately different sentence for criminal conduct of differing severity.

See 2024 Guidelines Manual, pg. 1-5.

**The need to avoid unwarranted sentence disparities.**

Sixth, the Court must consider the need to avoid unwarranted sentence disparities. When a district court "correctly calculates and carefully reviews the Guidelines range, it necessarily gives significant weight and consideration to the need to avoid unwarranted disparities," *Gall*, 552 U.S. at 54. Additionally, the Tenth Circuit has emphasized the importance of the word *unwarranted* and noted that reports on national averages are not dispositive because they do not provide information into a defendant's individual history and characteristics. *United States v. Lucero*, 130 F.4th 877, 887 (10th Cir. 2025). The national average in 2024 for sentences imposed under U.S.S.G. § 2G2.2 was 116 months, and the Tenth Circuit average was 108 months. However, those statistics provide no information regarding the specific offense conduct.

A review of sentences imposed in other cases involving AI generated is instructive as all defendants were sentence above the national average: *United States v. Jordan Fautz*, 24-cr-26-DJH (Western District of Kentucky) *United States v. James Smelko*, 22-cr-00146-MJH (Western District of Pennsylvania); *United States v. Eric Bretland*, 24-cr-00102-TMR (Southern District of Ohio); and *United States v. David Tatum*, 22-cr-157 (Western District of North Carolina).

A sentence of 20 years, although outside the average range, would not be an *unwarranted* disparity for this defendant. Furthermore, as previously argued, the Guidelines fail to consider the pattern of victimization in this case.

**The need for restitution.**

Lastly, seventh, the need for restitution is a factor the Court should consider. Although restitution is requested, the defendant and his wife liquidated their assets while the defendant was pending sentencing and therefore, the defendant has limited means to pay restitution, and this factor has minimal impact on the government's recommended sentence.

VI.    <u>CONCLUSION</u>

The government asserts a 20-year sentence is appropriate for the specific factors identified above. The guidelines do not adequately consider the facts surrounding the defendant's actions; therefore, an upward departure is warranted. Alternatively, an upward variance is also appropriate, for the same reason; the advisory sentencing guidelines do not properly consider the facts of this offense. As it stands, the guideline range of 151-188 woefully underrepresents the number of victims and the harm the defendant's conduct inflicted on those victims. A sentence of 20 years is sufficient, but not greater than necessary to achieve the sentencing objectives of 18 U.S.C. § 3553.

Respectfully submitted,

RYAN A. KRIEGSHAUSER
United States Attorney

*/s/ Sara L. Walton*
Sara L. Walton, KS Bar No. 24106
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683

Ph: 785.295.2850 (Office)
Fax: 785.295.2853
sara.walton@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Sara L. Walton
Sara L. Walton
Assistant United States Attorney